■ LONG ISLAND LIGHTING COMPANY, Plaintiff, and KEYSPAN CORPORATION, Appellant, v ALLIANZ UNDERWRITERS INSURANCE COMPANY et al., Defendants, and CENTURY INDEMNITY COMPANY et al., Respondents. [805 NYS2d 74]—

Order, Supreme Court, New York County (Ira Gammerman, J.), entered on or about January 8, 2004, which, in a declaratory judgment involving insurance coverage for certain environmental cleanup costs, upon defendants-respondents' motions for partial summary judgment declaring that their policies do not cover losses at the Syosset landfill site due to plaintiffs' failure to comply with the notice provisions in their respective policies, insofar as appealed from, dismissed plaintiff-appellant's claims

for coverage in connection with the Syosset landfill site, modified, on the law, to declare that defendants-respondents are not obligated to defend or indemnify plaintiffs in connection with the Syosset landfill site, and otherwise affirmed, without costs.

Plaintiff failed to satisfy its obligation under the subject policies to give notice upon the happening of an occurrence "reasonably likely" to involve the policies. Such occurrence happened not when plaintiff was sued in the underlying action some five weeks before giving defendants notice of the Syosset claim, but almost six months earlier, when plaintiff received a letter from the underlying plaintiff's lawyer threatening a lawsuit over the Syosset site (see *Christiania Gen. Ins. Corp. v Great Am. Ins. Co.*, 979 F2d 268, 276 [2d Cir 1992]). We reject plaintiff's argument that there was a reasonable possibility that the subject policies, both excess, would not be reached by the Syosset claim, where plaintiff offers no evidence that the timing of its notice was the result of a deliberate determination to that effect, and not, as the record suggests, the belief that it was not responsible for the Syosset cleanup costs. Nor does it avail plaintiff to argue that defendants were not prejudiced by the late notice (see *Great Canal Realty Corp. v Seneca Ins. Co., Inc.*, 5 NY3d 742 [2005]; *Argo Corp. v Greater N.Y. Mut. Ins. Co.*, 4 NY3d 332, 339 [2005]; *Security Mut. Ins. Co. of N.Y. v Acker-Fitzsimons Corp.*, 31 NY2d 436, 440 [1972]; see also *Matter of Brandon [Nationwide Mut. Ins. Co.]*, 97 NY2d 491, 496, n 3 [2002]). Concur—Andrias, J.P., Saxe and Sweeny, JJ.

Ellerin and Catterson, JJ., dissent in a memorandum by Catterson, J., as follows: Because I believe genuine issues of material fact exist, I respectfully dissent. Specifically, I believe the motion court improperly determined, as a matter of law, that notice to excess insurers Century Indemnity Company (Century) and General Reinsurance Corporation (General Re) was triggered by plaintiff's receipt of a form letter sent by the Town of Oyster Bay (Town) to 37 Long Island companies in September 1993.

Initially, both excess insurer defendants asserted that the obligation to give notice arose in 1990 when the Long Island Lighting Company (LILCO) was informed by the Environmental Protection Agency (EPA) that it was a potentially responsible party. LILCO, on the other hand, claimed that the notice obligation was triggered only after the Town winnowed out the list of 37 and commenced a lawsuit against just 15 of those companies.

Factual issues, therefore, remain as to what LILCO reasonably believed regarding its liability after receipt of the 1993 letter. Factual issues also exist as to when LILCO reasonably

believed that the Town's claim would implicate the excess policies. For these reasons I cannot agree that as a matter of law LILCO failed to comply with the subject notice provisions.

The underlying lawsuit in this declaratory judgment action involves the accumulation of hazardous waste at the Syosset landfill operated by the Town from 1933 to 1975. LILCO and its successor in interest, KeySpan Corporation, used the landfill from 1954 until 1975, when the landfill was closed by the Nassau County Department of Health.

On February 2, 1989, the EPA advised LILCO in writing that it had "documented the release of hazardous substances at the Syosset landfill site," and requested information from LILCO "[t]o ascertain the nature of the materials you generated, treated, transported and/or disposed of." By a letter dated March 3, 1989, LILCO advised the EPA that between the years 1954 and 1975, the only material it was aware it had deposited at the landfill was "construction and demolition waste."

The EPA and LILCO continued corresponding until August 3, 1990, when the EPA sent LILCO a copy of the "Superfund Proposed Plan for the Syosset Landfill Superfund Site." The proposal listed plans with varying costs for the cleanup, with a cost of $26.2 million dollars for the plan favored by the EPA.

Approximately three years later, on September 3, 1993, the Town sent a letter to LILCO asserting that LILCO, along with others, was liable under federal and state statutes for all or a portion of the costs of the cleanup which was ongoing.[1] Attached to the letter was a list of 37 other Long Island companies, which the Town described as "parties [also] receiving notice of the Town's claim."

On February 18, 1994, the Town commenced a lawsuit in the United States District Court for the Eastern District of New York against just 15 of those companies, including LILCO, seeking, inter alia, a declaration that the defendants were obligated to pay for cleanup and removal costs at the landfill. On March 25, 1994, LILCO informed its various insurers, including the defendants Century and General about the lawsuit.

Century and its predecessor companies had issued eight excess liability policies to LILCO during the period between 1957 and 1966. The self-insured retention varied from $25,000 in the

---

1. The letter stated in relevant parts: "The Town believes that LILCO arranged for the disposal of hazardous substances at the Site . . . and, accordingly that LILCO is liable . . . for all or a portion of those costs . . . If it is not possible to settle this matter . . . the Town expects to commence an appropriate action against LILCO and other potentially responsible parties."

1957 policy to $100,000 in the 1962-1966 policies. General Re issued four upper-layer excess policies to LILCO from 1954 to 1966.

In the letter of March 25, 1994, LILCO requested of Century and General Re, as it did of its other insurers, that they provide defense costs and indemnification. LILCO informed all the carriers that it had retained attorneys to defend it in a lawsuit where a finding against any or all of the defendants raised the possibility of joint and several liability. Subsequently, LILCO brought this declaratory judgment action against all the insurers who failed to respond positively.

Several defendant carriers, other than Century and General Re, moved to dismiss the complaints. The motion court dismissed them, concluding that because the coverage provided by the primary carriers and the self-insured retention would not be exceeded to reach the coverage provided by these carriers, the claims against these carriers were not justiciable. The complaints against other carriers were dismissed for other reasons, including bankruptcy.

In June and July 2000, Century and General Re moved and cross-moved for partial summary judgment. Both asserted that LILCO's obligation to give notice arose in 1990, upon being advised by the EPA that LILCO was identified as a potentially responsible party. LILCO claimed that it did not appear "reasonably likely" that it faced liability until the Town commenced its lawsuit against multiple defendants including LILCO in February 1994 and that, therefore, its notice to both insurers was timely. More significantly, LILCO argued that the allocation of losses among the various insurers over the life of the landfill was a relevant inquiry because such inquiry would demonstrate which of the excess policies were implicated, and thus when the notice to those excess insurers would have been necessary.

New York law unfortunately provides that because "[n]otice provisions in insurance policies afford the insurer an opportunity to protect itself . . . [a]bsent a valid excuse, a failure to satisfy the notice requirement vitiates the policy, and the insurer need not show prejudice before it can assert the defense of noncompliance." (*Security Mut. Ins. Co. of N.Y. v Acker-Fitzsimons Corp.*, 31 NY2d 436, 440 [1972] [citations omitted].)[2] The motion court's determination that LILCO failed to comply

---

2. Despite the public policy considerations set out in my plurality opinion to the contrary in *Great Canal Realty Corp. v Seneca Ins. Co., Inc.* (13 AD3d 227 [2005]), the Court of Appeals has steadfastly refused to yield ground on this point. (*See Rekemeyer v State Farm Mut. Auto. Ins. Co.*, 4 NY3d 468 [2005].)

with the notice provisions was made on the basis that, after receipt of the 1993 letter, LILCO should have gleaned that there was a "reasonable possibility" of the policies' involvement. The court held that, as of that date, "LILCO knew that the Town of Oyster Bay would hold it responsible for the materials disposed of at the landfill, and that this potential liability could be as much as $26.2 million."

The relevant factual inquiry here is the reasonableness of LILCO's beliefs about its liability at the time of the letter. In particular, questions arise as to whether it was reasonable for LILCO to believe, after receipt of the 1993 letter, that it would be liable, and if so whether LILCO believed that the Town's claim would implicate the excess policies.

The well-settled law of this jurisdiction is that an insured's delay or failure to give timely notice may be excused where the insured has a reasonable belief that it would not be liable. (*Paramount Ins. Co. v Rosedale Gardens*, 293 AD2d 235, 239 [2002].) At issue is not whether an insured believes that he or she will ultimately be found liable but whether he or she has a reasonable basis for a belief that no claim will be asserted against him or her. (*SSBSS Realty Corp. v Public Serv. Mut. Ins. Co.*, 253 AD2d 583, 584 [1998].)

In this case, LILCO asserts that the 1993 letter was sent after a three-year period of silence on the issue of the landfill; that there was no communication between the EPA, the Town and LILCO during that period; and that the letter reiterated the Town's belief that LILCO had arranged for the disposal of hazardous substances at the site but the Town offered no factual basis for that claim or any additional facts whatsoever. LILCO contends that the letter appeared to be no more than a form letter that was also sent to 37 other Long Island companies—more than half of which were subsequently not named as defendants in the lawsuit commenced by the Town. Thus, LILCO maintains that a question of fact exists as to whether it was reasonable for it to believe that no claim would be asserted against it.

Further, LILCO argues that the defendants fail to distinguish between notice obligations under primary policies and those under excess policies. It argues that the issue is whether it appeared likely, before the commencement of the lawsuit, that the company would face sufficient liability to implicate the excess policies.

The landmark case of *American Home Assur. Co. v. International Ins. Co.* (90 NY2d 433 [1997]) extended the no-prejudice exception to excess insurers, holding that they have the same interests as primary insurers, and that therefore, notice provi-

sions apply equally where they are concerned. The Court noted the difference between primary insurance coverage and excess insurance coverage by observing that the term "primary" insurance is "used to distinguish the coverage that is *immediately* triggered upon a defined occurrence from 'excess' insurance, i.e., coverage which is triggered only after the former is exhausted." (*Id.* at 441 n 2 [emphasis added], citing *American Home Assur. Co. v Republic Ins. Co.*, 984 F2d 76, 77 [2d Cir 1993], *cert denied* 508 US 973 [1993].) By logical extension, as the plaintiff asserts, the obligation to provide notice to an excess insurer does not arise at the same time as does the obligation to provide notice to a primary insurer (that is upon the happening of an occurrence or event likely to give rise to a claim), but upon the insured "reasonably conclud[ing]" that a covered occurrence is likely to "trigger" the excess policy. (*See Olin Corp. v American Re-Ins. Co.*, 74 Fed Appx 105, 107-108 [2d Cir 2003].)

Indeed, the facts of *American Home* (90 NY2d 433, *supra*) support this conclusion. The case involved carbon monoxide poisoning causing a family of five to perish after its gas furnace was improperly installed by the insured, Mobile Gas. Within days of the accident in December 1985, attorneys for Mobile notified its primary insurer, Liberty Mutual, of total culpability and "horrendous damages" which would exceed $5 million. The primary insurance policy provided coverage up to $300,000, but it took more than six weeks before American Home Assurance, the first-level excess insurer, was informed of the accident. Nevertheless, there was no disclaimer of coverage by American on the basis of late notice.[3]

Federal courts applying New York law on notice requirements have concluded that "an insured's obligation to notify its excess carrier[s] is slightly different from the obligation to notify its primary carrier." (*Green Door Realty Corp. v TIG Ins. Co.*, 329 F3d 282, 288 [2003], citing *Olin Corp. v Insurance Co. of N. Am.*, 743 F Supp 1044 [SD NY 1990], *affd* 929 F2d 62 [2d Cir 1991].) In effect, excess and primary insurance policies have "different notice accrual points." (*Olin Corp. v American Re-Ins. Co.*, 74 Fed Appx at 108, *supra*, citing *American Home Assur. Co. v Republic Ins. Co.*, 984 F2d at 77.)

Thus, in determining whether LILCO's notice to its excess insurers was timely, an additional question of fact exists as to whether LILCO demonstrated a reasonable belief that the

---

3. The disclaimers were made by two second-level excess insurers who were notified by American after a negotiated settlement wiped out the primary insurance as well as American's excess coverage.

claims were not of "sufficient magnitude to penetrate through the primary coverage and reach the excess policies." (*Olin Corp. v American Re-Ins. Co.*, 74 Fed Appx at 108.) LILCO claims that relevant to making the assessment as to whether any excess policies would be implicated at all is a calculation based on the spread of the damages over the number of policy years. The trial court rejected the argument although the court itself used the method of spreading the worst-case estimate of damages across the policy years at issue to initially determine which excess insurers would not be reached, and thus who could be dismissed from LILCO's declaratory judgment action.

LILCO's assertion that taking the spread into account is absolutely essential to the determination of whether a notice obligation arose upon receipt of the 1993 letter is supported by the observation that when a notice obligation is triggered only by a claim that is *reasonably likely to implicate* a given policy, the insured must necessarily weigh all the factors that would affect the policy being implicated. In this case, LILCO maintains that a finder of fact could reasonably have concluded that it did not appear likely that a claim spread among the decades of triggered policies would reach any of the excess policies at issue. Additionally, whether LILCO's belief about the implication of its excess policies was, in fact, based on any such assessment is another question for the finder of fact, and should not have been resolved by the court on summary judgment. (*Argentina v Otsego Mut. Fire Ins. Co.*, 86 NY2d 748 [1995] [whether a good-faith belief exists and whether that belief is reasonable under the circumstances are ordinarily questions for the finder of facts].)

For the foregoing reasons I disagree with the majority decision granting partial summary judgment to the defendants and dismissing the plaintiff's claims for coverage in connection with the underlying lawsuit.