**Brooklyn Union Gas Co. v Century Indem. Co.**

2024 NY Slip Op 30032(U)

January 5, 2024

Supreme Court, New York County

Docket Number: Index No. 403087/2002

Judge: Gerald Lebovits

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

**PRESENT:** <u>**HON. GERALD LEBOVITS**</u>      **PART**        **07**

*Justice*

-------------------------------------------------------------------------------X

BROOKLYN UNION GAS COMPANY,

                     Plaintiff,

                - v -

CENTURY INDEMNITY CO. and MUNICH REINSURANCE
AMERICA INC,

                     Defendants.

-------------------------------------------------------------------------------X

| | |
|---|---|
| **INDEX NO.** | 403087/2002 |
| **MOTION SEQ. NO.** | 053 054 |

**DECISION + ORDER ON MOTION**

The following e-filed documents, listed by NYSCEF document number (Motion 053) 467, 468, 536, 537, 538, 539, 540, 541, 542, 543, 544, 545

were read on this motion to         <u>MODIFY DECISION/ORDER/JUDGMENT</u>.

The following e-filed documents, listed by NYSCEF document number (Motion 054) 469, 470, 471, 472, 473, 474, 475, 476, 477, 478, 479, 480, 481, 482, 483, 484, 485, 486, 487, 488, 489, 490, 491, 492, 493, 494, 495, 496, 497, 498, 499, 500, 501, 502, 503, 504, 505, 506, 507, 508, 509, 510, 511, 512, 513, 514, 515, 516, 517, 518, 519, 520, 521, 522, 523, 524, 525, 526, 527, 528, 529, 530, 531, 532, 533, 534, 535, 546, 547, 548

were read on this motion to         <u>SET ASIDE VERDICT</u>.

*O'Melveny & Myers LLP*, New York, NY (Jonathan Rosenberg, Anton Metlitsky, and Leah Godesky of counsel), and Los Angeles, CA (Daniel Petrocelli and Craig P. Bloom of counsel), for plaintiff.
*Covington & Burling LLP*, Washington, D.C. (Benjamin Razi and Michael Lechliter of counsel), and San Francisco, CA (Gretchen Hoff Varner and Ryan Buschell of counsel), for defendant Brooklyn Union Gas Company.

Gerald Lebovits, J.:

      These motions arise from a jury verdict entered in two insurance-coverage actions joined for trial: this action and *Century Indemnity Co. v Brooklyn Union Gas Co.*, Index No. 603405/2001 (Sup Ct, NY County).[1] As relevant here, Century Indemnity Company provided excess-insurance coverage to Brooklyn Union Gas Company for nearly three decades in the middle of the last century. The two coverage actions concern the extent, if any, of Century's obligations to provide coverage for costs incurred by Brooklyn Union in government-mandated

---

[1] A version of this decision has also been filed in the *Century Indemnity* docket. The NYSCEF citations given in this decision correspond to that docket.

cleanup of three former manufactured-gas plants (MGPs) located on the Gowanus Canal in Brooklyn, New York.

With respect to whether Century must cover some portion of these cleanup costs under the policies it issued to Brooklyn Union, the jury found that Brooklyn Union had proven that it provided timely notice to Century with respect to each of the three occurrences at issue.[2] (*See* NYSCEF No. 1281 at 26-27, 36-37, 45-46 [verdict sheet].) The jury also found that Brooklyn Union had proven that most of (but not all) the property damage for which Brooklyn Union seeks coverage was "accidental" (not "expected or intended") and thus within the scope of coverage of the various Century insurance policies at issue. (*See id.* at 1-18.)

The length of the periods of property damage at the three MGP sites is important for determining the pro rata share of Brooklyn Union's total cleanup costs that Century must cover under the policies at issue. (*See Century Indem. Co. v Brooklyn Union Gas Co.*, 170 AD3d 632, 633 [1st Dept 2019], citing *Consolidated Edison Co. of N.Y. v Allstate Ins. Co.*, 98 NY2d 208, 223 [2002] [discussing pro rata allocation].) The jury found that property damage at the Citizens MGP site began in 1860 and ended in 2017 (NYSCEF No. 1281 at 19-21); that property damage at the Fulton MGP site began in 1879 and ended in 2015 (*id.* at 29-31); and that property damage at the Metropolitan MGP site began in 1872 and ended in 2002 (*id.* at 39-41).

The total cleanup costs allocated to each year in which the Century policies were in effect are subject, under the policies, to per-occurrence coverage limits. This court held as a matter of law during trial that with respect to the policies that had multi-year terms (or, in one case, contained a multi-year renewal), those per-occurrence limits were limits for these policies' entire terms and did not reset annually. (*See Century Indem. Co. v Brooklyn Union Gas Co.*, 2022 NY Slip Op 50388[U], at *7-15 [Sup Ct, NY County 2022].[3])

Brooklyn Union and Century each now move under CPLR 4404 to challenge some of the jury findings and rulings set forth above. On motion sequence 055, Brooklyn Union seeks to set aside this court's ruling that the multi-year policies' per-occurrence limits apply on a term, rather than annual basis. (*See* NYSCEF No. 1221 [notice of motion].) On motion sequence 056, Century asks the court to set aside the jury's verdict with respect to the end dates of property damage at the three MGP sites (and the Gowanus Canal), and to grant Century judgment as a matter of law or, alternatively, order a new trial. (*See* NYSCEF No. 1227 [notice of motion].) Century also challenges the court's trial ruling that the costs of the Gowanus Canal's remediation should be apportioned equally among the three MGP sites for purposes of the policies' per-occurrence limits.

The parties' respective motions are denied.

---

[2] Each occurrence consists of environmental contamination at a particular MGP site and the related contamination of the Gowanus Canal. (*See Century Indem. Co. v Brooklyn Union Gas Co.*, 2018 NY Slip Op 52018[U], at *4-6 [Sup Ct, NY County 2018], *affd as mod on other grounds* 170 AD3d 632 [1st Dept 2019].)

[3] That decision explains in more detail several of the court's trial rulings. (*See* 2022 NY Slip Op 50388[U], at *1.)

## DISCUSSION

**I.     Brooklyn Union's Challenge to this Court's Ruling on Whether the Century Policies' Per-Occurrence Limits Apply on a Term or Annual Basis (Mot Seq 055)**

CPLR 4404 (a) provides that "[a]fter a trial of a cause of action or issue triable of right by a jury," a court may on motion "set aside a verdict or any judgment entered thereon" and direct entry of judgment in favor of a party as a matter of law. Alternatively, the court may "order a new trial of a cause of action or separable issue where the verdict is contrary to the weight of the evidence" or "in the interest of justice." (CPLR 4404 [a].) Brooklyn Union moves under CPLR 4404 (a) to challenge this court's ruling that the multiyear Century policies' per-occurrence limits are applied on a term, not annual, basis.

As a procedural matter, this motion is slightly unusual: Brooklyn Union is not challenging the jury's verdict, and final judgment on that verdict has not yet been entered. But Brooklyn Union persuasively contends that this court may (and should) rule on its challenge to the court's per-occurrence-limits ruling now, because resolving that challenge will have an important effect on the court's future calculation of the final judgment. (NYSCEF No. 1222 at 1 [mem. of law].) It is, in effect, a preemptive request to set aside (part of) the judgment that would otherwise be entered on the jury's verdict, and a request to rule for Brooklyn Union as a matter of law about how to calculate that aspect of the judgment. Century does not raise a procedural objection to the relief requested on this motion, nor the vehicle by which Brooklyn Union is seeking that relief. This court therefore proceeds to the merits of the motion.

### A. Background

The Century policies at issue do not contain aggregate coverage limits; only per-occurrence limits. The language of those per-occurrence limits does not specify the period of time over which they apply. It is undisputed that for the policies having a one-year term, the per-occurrence limits apply on an annual basis. But the parties disagree about whether policies with a multi-year term (or renewed for a multi-year period) *also* have annual per-occurrence limits, or whether the limit applies for the policy's full term.

The Appellate Division, First Department, held in 2019 that the multi-year policies are ambiguous about the period over which their per-occurrence limits apply. (*See Century Indem.*, 170 AD3d at 633.) Before trial, this court held, over Brooklyn Union's objection, that Century could introduce expert testimony at trial that would bear on this interpretive question. (*See Century Indem. Co. v Brooklyn Union Gas Co.*, 2022 NY Slip Op 50083[U], at *2-5 [Sup Ct, NY County 2022] [ruling on motion in limine].) After hearing the trial testimony of Century's expert, however, the court concluded that the testimony was insufficiently probative to raise a jury question that might resolve the policies' ambiguity. (*See* NYSCEF No. 1296 at Tr. 2813, 2898-2900 [trial transcript].) And Brooklyn Union did not introduce extrinsic evidence on how the policies should be interpreted. As a result, this court concluded that resolving the ambiguity in the policies was for the court to determine as a matter of law. (*Id.* at Tr. 2813-2814; *see*

[* 3]

*Century Indem. Co.*, 2022 NY Slip Op 50083[U], at *2-3 [discussing legal framework for resolving ambiguous insurance-policy provisions].)

This court's resolution of the issue involved two steps. *First*, the court rejected Brooklyn Union's argument that the court's interpretation of the policy should be undertaken in light of the principle of "contra proferentem"—that policy ambiguities should be construed against the drafter (here, Century). (*See Century Indem.*, 2022 NY Slip Op 50388, at *9-14 [explaining this ruling].) *Second*, the court concluded that, absent application of contra proferentem, the best interpretation of the multi-year policies is that their per-occurrence limits apply on a term, not annual, basis. (*See id.* at *14-15 [same].)

Brooklyn Union now challenges both steps of this court's analysis. This court is not persuaded that it erred at either step. Brooklyn Union's motion is denied.

## B. Brooklyn Union's Argument that the Contra Proferentem Interpretive Doctrine Should be Applied in Construing the Century Policies

### 1. Whether Appellate Division Decisions Construing Insurance Policies Foreclose Application of Contra Proferentem Here

This court's explanation of its contra-proferentem holding—that this doctrine did not apply to the Century policies because Brooklyn Union was a sophisticated policyholder—focused most closely on two decisions interpreting insurance policies: *Loblaw, Inc. v Employers' Liab. Assur. Corp.* (85 AD2d 880, 881 [4th Dept 1981], *affd on other grounds* 57 NY2d 872 [1982]) and *Westchester Fire Ins. Co. v MCI Communications Corp.* (74 AD3d 551, 551 [1st Dept 2010]). (*See Century Indem.*, 2022 NY Slip Op 50388[U], at *9-12.) Brooklyn Union now argues that this court erred in holding that these decisions are on point and require a conclusion that contra proferentem is inapplicable to the Century policies. (*See* NYSCEF No. 1222 at 7-11.) This court disagrees.

Brooklyn Union contends that the scope of the Fourth Department's holding on this issue in *Loblaw* is limited to the proper construction of ambiguous exclusionary clauses. (*See id.* at 10.) Brooklyn Union bases this contention on *Loblaw*'s citation to three appellate decisions construing policy exclusions. (*Id.*, citing *Loblaw*, 85 AD2d at 881.) But *Loblaw* cites those decisions in describing the policyholder's argument, not the court's conclusion. (*See* 85 AD2d at 881.) Additionally, that argument itself, as described, is not that ambiguous exclusions must be construed in favor of coverage, but that ambiguities must generally be construed against the insurer. (*See id.*) And at least two of those cited decisions draw on the broader principle of construing ambiguities against the insurer, not merely construing ambiguous exclusions in favor of coverage. (*See Breed v Insurance Co. of N. Am.*, 46 NY2d 351, 353 [1978]; *Hollander v National Wide Mut. Ins. Co.*, 60 AD2d 380, 384 [4th Dept 1978].)

More fundamentally, the dispute in *Loblaw* was about how broadly to construe a notice requirement in the policy at issue—a requirement for obtaining defense or indemnification even for concededly covered occurrences, not an ouster of coverage for certain kinds of occurrences

[* 4]

regardless of timely notice. In that context there would be no reason for *Loblaw* to have relied on interpretive principles applicable only to construing exclusionary clauses.[4]

Brooklyn Union is also mistaken in arguing that *Standard Marine Ins. Co. Ltd. v Federal Ins. Co.* (39 AD2d 444, 446 [1st Dept 1972]), the decision on which *Loblaw* relies for its interpretive conclusion, did not involve application of contra proferentem. (*See* NYSCEF No. 1222 at 10.) Indeed, *Standard Marine* expressly considered and rejected the argument by defendant insurer that plaintiff insurer's policy covered the loss because "the clause in question is ambiguous and therefore must be construed against the [plaintiff] in favor of the party seeking coverage"—*i.e.*, contra proferentem. (39 AD2d at 446.) Brooklyn Union asserts on reply that this principle, as described in *Standard Marine*, *Loblaw*, and other decisions, is not "a shorthand for contra proferentem." (NYSCEF No. 1303 at 9 [italics omitted].) But Brooklyn Union does not identify what the principle *is*, if not contra proferentem. In any event, that bare, unsupported assertion is contradicted by some of the Court of Appeals decisions from which Brooklyn Union itself quotes in the following paragraph of its reply.[5] (*See id.* at 10, quoting *Taylor v. United States Cas. Co.*, 269 NY 360, 364 [1936] ["[A]mbiguity will be resolved against the insurer, under the principle of contra proferentem."].)

Brooklyn Union also argues that this court misconstrued the First Department's decision in *Westchester Fire* to apply beyond cases in which insured and insurer jointly draft the policy at issue. (*See* NYSCEF No. 1222 at 8-9.) Brooklyn Union is correct that on appeal to the First Department, the insurer's first argument against application of contra proferentem was that the policies in question were jointly drafted. (*See id.* at 8-9, quoting Br. for Defendants-Respondents, *Westchester Fire*, 2010 WL 8899052, at *32.) But as this court has previously noted, the next sentence of the insurer's brief contended that "[w]here the insured is a sophisticated entity, acting as a self-insurer and represented by a large corporate broker, the contra proferentem rule of construing a policy against the insurer is not applicable." (Br. for Defendants-Respondents, *Westchester Fire*, 2010 WL 8899052, at *32.) And it was *that* contention, not the joint-drafting argument, that the First Department accepted in its decision. (*See Westchester Fire*, 74 AD3d at 551 ["[C]ontra proferentem . . . would be inapplicable to this sophisticated policyholder."])

Further, as this court pointed out in its post-trial ruling, (*Century Indem.*, 2022 NY Slip Op 50388[U], at *10), the First Department held again in 2017 that "the doctrine of contra proferentum . . . is inapplicable to [defendant], a sophisticated policyholder." (*Certain Underwriters at Lloyd's, London v Essex Global Trading, Inc.*, 147 AD3d 595, 596 [1st Dept

---

[4] Brooklyn Union's suggestion on reply that *Loblaw* "may have misapplied these 'exclusion' cases" in addressing a dispute over a notice provision (NYSCEF No. 1303 at 11 n 2) begs the question.

[5] For similar reasons, this court disagrees with Brooklyn Union's claim that *New Amsterdam Casualty Co. v Fidelity & Casualty Co. of N.Y.* (400 F2d 237 [9th Cir 1968]), relied on by *Standard Marine*, "did not mention or apply contra proferentem." (NYSCEF No. 1222 at 10 [italics omitted].) As Brooklyn Union acknowledges in quoting from that decision, *New Amsterdam* carefully distinguishes "the rule of liberal construction in favor of an insured" in a "contest between insured and insurer" as inapposite to an action between insurers like the one then before the court. (NYSCEF No. 1222 at 10, quoting *New Amsterdam*, 400 F2d at 239.)

[* 5]

2017], citing *Westchester Fire*, 74 AD3d 551.) Brooklyn Union contends that this statement is "pure dicta" because the court reached that conclusion on its own, without briefing from the parties. (NYSCEF No. 1303 at 13-14.) But that contention does not follow.[6] Brooklyn Union also asserts, in effect, that this court should disregard *Essex Global Trading* as erroneous because it "simply misreads the admittedly vague reasoning in *Westchester Fire*, and does not engage with any other contra proferentem decision." (*Id.* at 13 [italics omitted].) This court does not agree that *Westchester Fire*'s reasoning is vague. Nor, in any event, could this court ignore an on-point Appellate Division decision based on a disagreement with that decision's analysis.

### 2. Whether Appellate Division Decisions Construing Contracts More Generally Foreclose Application of Contra Proferentem Here

This court's prior explanation of its trial ruling about contra proferentem focused on decisions construing insurance policies, because those decisions most directly govern here. Brooklyn Union suggests this focus was error because the "doctrine of contra proferentem applies to all contracts, not merely insurance policies." (NYSCEF No. 1222 at 3 [italics omitted].) This court agrees with that characterization of the doctrine—but it does not aid Brooklyn Union here.

The First Department has held twice in the last four years in non-insurance contract cases that contra proferentem does not apply when the contracting parties are sophisticated—each time citing *Westchester Fire* for that proposition.[7] (*See Western & S. Life Ins. Co. v U.S. Bank N.A.*, 209 AD3d 6, 14 [1st Dept 2022] ["[W]e need not reach plaintiffs' contra proferentem argument because it is inapplicable to sophisticated parties such as plaintiffs."];[8] *Churchill Real Estate Holdings LLC v CBCS Washington St. LP*, 171 AD3d 426, 427 [1st Dept 2019] ["[T]he doctrine of contra proferentem is inapplicable here . . . because the parties are sophisticated."] [internal citation omitted].)

Brooklyn Union provides no countervailing authority for the proposition that contra proferentem applies even when the parties are sophisticated. It identifies a number of decisions in which courts have held that contra proferentem does not apply when the parties have jointly drafted the contract at issue. (*See* NYSCEF No. 1222 at 4-6; NYSCEF No. 1303 at 2-3.) That proposition, though, is neither here nor there for present purposes. And these decisions do not, as Brooklyn Union asserts, hold that "the *only* recognized exemption from contra proferentem

---

[6] As this court explained in its post-trial explanatory ruling, that the decision's rejection of contra proferentem rests on multiple grounds (lack of ambiguity and a sophisticated policyholder) does not render either of those grounds nonbinding dicta. The two grounds are alternative holdings, each binding on this court. (*See Century Indem.*, 2022 NY Slip Op 50388[U], at *10.)

[7] Given this contrary Appellate Division authority, Brooklyn Union's reliance on a 20-year-old decision of the U.S. Court of Appeals for the Second Circuit applying New York law, and statements from Restatements and treatises about what that law *should be*, is unavailing. (*See* NYSCEF No. 1222 at 6.)

[8] *Western & Southern*, though brought by an insurance company, did not involve insurance policies. It was a breach-of-contract challenge to the conduct of a trustee in managing various residential-mortgage-backed-security trusts. (*See* 209 AD3d at 8-10.)

[* 6]

for all ambiguous contracts requires the parties to have jointly drafted the ambiguous language." (NYSCEF No. 1303 at 4 [emphasis added].) That the presence of joint drafting is sufficient to render contra proferentem inapplicable does not make it *necessary* before the doctrine will be rendered inapplicable. Brooklyn Union provides no case holding that it is.

In short, this court adheres to its ruling at trial, as explained in its post-trial decision, that contra proferentem is inapplicable here.

### C. Determining the Scope of the Policies' Per-Occurrence Limits Absent Contra Proferentem

The question now becomes whether Brooklyn Union has identified an error in this court's conclusion that, absent the contra-proferentem presumption, the per-occurrence limits should be understood as applying on a term (not annual) basis. This court concludes that Brooklyn Union has not identified any errors.

As an initial matter, Brooklyn Union repeats its prior argument that the per-occurrence limits in the Century policies should be understood as exclusions, such that Century bears the burden of proving the applicability of those limits—not than the other way around. (NYSCEF No. 1222 at 13.) The court rejects Brooklyn Union's argument here for the same reasons set forth in its post-trial explanatory decision. (*See Century Indem.*, 2022 NY Slip Op 50388[U], at *14 & n 20, *21 & n 36.)

Brooklyn Union also contends again that because the multiyear policies are silent on the scope of the per-occurrence limits, without giving an "indication anywhere in [the] polic[ies] that the referenced 'policy period' governs the amount of per-occurrence limits available to the policyholder," the limits should be interpreted as applying on an annual basis. (NYSCEF No. 1222 at 14.) This court adheres to its prior rejection of that argument: "The most reasonable way to interpret a policy limit that does not specify the period over which it applies is that the limit applies for the length of time the policy is in effect—whether that be a year, two years, or five."[9] (*Century Indem.*, 2022 NY Slip Op 50388[U], at *15.)

Brooklyn Union contends that this reading of the policy is inconsistent with the determination of the Century policies' premiums, because "Century charged Brooklyn Union the same premium rates for periods with annual limits as it charged for periods during which Century asserted term limits applied." (NYSCEF No. 1222 at 15.) In other words, that "Century charged the same amount for each year of coverage from 1959 through 1965 is overwhelming evidence that the parties intended the same [per-occurrence] limits to apply." (*Id.*; *see also* NYSCEF No. 1303 at 17-18 [same].) This argument rests on premises that Brooklyn Union did not establish at trial.

---

[9] This court also adheres to its trial ruling excluding as unreliable and not probative excerpts from Century's Major Claims System, on which Brooklyn Union sought to rely to show that Century understood its multiyear policies as having annual per-occurrence limits. (*See* NYSCEF No. 1222 at 15 [renewing Brooklyn Union's argument that those excerpts should have been admitted].)

In particular, Brooklyn Union's argument assumes that in excess policies lacking aggregate limits, changes in the amount of those policies' per-occurrence limits will (or should) meaningfully affect the amount of the annual policy premiums. This assumption may be intuitive; but intuition alone is not enough to meet a party's interpretive burden of proof. And Brooklyn Union did not attempt to satisfy this burden through evidence about how excess-insurance markets functioned in the 1940s and 1950s.[10] The absence of evidence on these points is especially noticeable because the relevant regulatory environment has changed greatly since then. As Century points out, a question exists—which Brooklyn Union did not attempt to answer at trial—whether, at the time the policies were entered into (*i.e.*, before modern environmental-cleanup liability), a realistic possibility existed that losses from individual occurrences might approach or exceed a policy's per-occurrence limit, such that a change in those limits would meaningfully affect a policyholder's exposure to risk.[11]

To be clear, the court does not mean to suggest any particular conclusion about how insurance companies and policyholders at the relevant times understood per-occurrence limits, excess-policy premiums, or the relationship between them. It is possible that Brooklyn Union is correct in its assumption that a change in policy-term length, coupled with a lack of change in policy premium, indicates that the policy's per-occurrence limit did not change. (*See* NYSCEF No. 1222 at 15.) But on the evidence introduced at trial, Brooklyn Union did not meet its burden of proof. The court adheres to its prior ruling that the per-occurrence limits in the multiyear Century policies applied on a term rather than annual basis.

---

[10] As noted above in the Background section, *Century* attempted to introduce that evidence through testimony of an expert witness, Robert M. Anderson. This court concluded, however, that Century's proffered expert testimony on this issue was insufficiently probative to reach the jury. (*See Century Indem.*, 2022 NY Slip Op 50388[U], at *7-8.) And Century's arguments on Anderson's behalf notwithstanding (*see* NYSCEF No. 1294 at 19-22), this court remains of that view now.

[11] Brooklyn Union points out that Century, in opposing Brooklyn Union's motion in limine to preclude Anderson from testifying, stated that Anderson would opine that "[p]olicyholders routinely select term-limit policies to obtain higher limits at a lower cost that they would otherwise pay for annual-limit policies." (NYSCEF No. 1303 at 19-20, quoting NYSCEF No. 687 at 1.) To the extent that Brooklyn Union is raising an argument in the nature of judicial estoppel, this court is unpersuaded. This court's ruling denying the motion in limine did not rely on the substance of Anderson's likely opinions. (*See Century Indem.* 2022 NY Slip Op 50083[U], at *4-5.) it is difficult, therefore, to see why Century should be estopped now to adhere to those opinions—particularly since this court later found Anderson's testimony, once delivered, insufficient to raise a jury question. (NYSCEF No. 1296 at Tr. 2813, 2898-2900; *see All Terrain Props., Inc. v Hoy*, 265 AD2d 87, 93 [1st Dept 2000] [discussing requirements for application of judicial estoppel.])

In any event, this court's conclusion here does not rest on the factual premise that "there would have been little difference between the cost of annual and term limits," as Brooklyn Union describes Century's argument (*see* NYSCEF No. 1303 at 19, citing NYSCEF No. 1294 at 18), but on Brooklyn Union's failure to introduce evidence one way or the other on this issue.

INDEX NO. 403087/2002

RECEIVED NYSCEF: 01/05/2024

Brooklyn Union's motion is denied.

## II.    Century's Challenges to the Jury's Verdict (Mot Seq 056)

In moving under CPLR 4404 to set aside the jury's verdict and grant judgment as a matter of law or a new trial, Century advances a range of arguments challenging the verdict. Some of these arguments relate to asserted trial errors about what evidence was (and was not) put before the jury, and the instructions provided by the court to the jury; some relate to the sufficiency of the evidence supporting the jury's findings. This decision addresses first Century's arguments about trial error, and then considers its sufficiency challenge.

### A. Century's Trial-Error-Based Challenges to the Jury's Verdict

#### 1. Century's challenges to this court's pretrial and trial rulings on the relationship between notice and pro-rata allocation

The Century excess policies at issue "require Brooklyn Union to provide written notice 'as soon as practicable' following 'the happening of an occurrence or accident that appears reasonably likely to involve liability on the part of [the insurer].'" (*Century Indem. Co. v Brooklyn Union Gas Co.*, 74 Misc 3d 733, 735 [Sup Ct, NY County 2022], quoting NYSCEF No. 615 at 13 [bates-number CEN000405].) The policies' liability threshold (often called the attachment point) is $100,000. (*Id.*) It is law of the case that, allocating pro rata Brooklyn Union's losses across the total period of injury at each site, the Century policies do not kick in for liability purposes until Brooklyn Union has incurred losses well above that attachment point.[12] (*See Century Indem.*, 170 AD3d at 633.)

This court held, in resolving a pretrial motion in limine, that the jury must also take pro rata allocation into account in considering when Brooklyn Union was required to provide Century with *notice* of an occurrence, as well. (*Century Indem.*, 74 Misc 3d at 744.) Century now argues that the court's pretrial notice holding, and several evidentiary and instructional rulings at trial that followed from that holding, were materially erroneous and prejudicial. This court is unpersuaded.

Some of Century's contentions on this motion mirror arguments it made to the court—and which the court rejected—during briefing on the notice-related motion in limine. (*Compare* NYSCEF No. 1228 at 17-21, and NYSCEF No. 1304 at 17-18, *with Century Indem.*, 74 Misc 3d at 736-744.) With respect to those contentions, this court adheres to its earlier analysis.[13]

---

[12] The parties disagree about how to determine the amount by which the losses must exceed $100,00 in order to implicate the Century policies. (*See Century Indem.*, 2022 NY Slip Op 50388[U], at *18-20.) That issue is not before the court on the current motion, however.

[13] For that reason, the court is also not persuaded by Century's argument that the court should have permitted testimony from a potential expert witness "that a reasonable utility in Brooklyn Union's position would have known before 1992 that the Citizens, Fulton, and Metropolitan MGPs would require significantly more than $100,000 in environmental response costs." (NYSCEF No. 1228 at 20.)

[* 9]

Additionally, Century's motion papers repeat a contention it raised only at oral argument the first time around. (*See Century Indem.*, 74 Misc 3d at 744 n 16 [discussing this argument].) The court discusses that contention at slightly more length. Century contends that "notice under the policies is due once an occurrence that is likely to involve the policies happens," and that the "occurrences at issue happened decades ago," *i.e.*, when the MGP sites and the Gowanus Canal were contaminated. (NYSCEF No. 1228 at 19.) Therefore, Century says, Brooklyn Union needed to provide an excuse for its delay in giving notice based on a good-faith, reasonable belief that the Century policies would not be reached—and that the application of pro rata allocation could not furnish such an excuse because Brooklyn Union had not taken it into account in delaying notice. (*Id.* at 18-19.)

As this court noted in its ruling in limine (*see Century Indem.*, 74 Misc 3d at 744 n 16), the problem with this argument is that it considers only half of the policies' notice requirement. Notice is not due when an occurrence (such as property damage due to environmental contamination) happens. Notice becomes due when that occurrence "appears reasonably likely to involve liability on the part of" Century (*id.* at 735)—that is, once it is reasonably likely that Brooklyn Union will suffer covered losses exceeding the policy's attachment point. Brooklyn Union was not required to justify its failure to provide timely notice in the 1950s, as would be the case under Century's argument. That is because notice was not due in the first place until it became reasonably likely, decades later, that Brooklyn Union would have to pay amounts for government-mandated environmental remediation that would exceed the post-allocation attachment point of the policy.[14]

Century also now contends that this court erred in precluding evidence that "a reasonable policyholder in Brooklyn Union's position [in the late 1980s and early 1990s] would not have assumed that pro rata allocation would have applied, and thus would not have withheld notice on that ground." (NYSCEF No. 1228 at 19-20.) This contention misapprehends the nature of the post-allocation notice inquiry. The question is not whether a reasonable policyholder in Brooklyn Union's position would have considered how allocation might affect the likelihood of the policy

---

[14] Century disclaims any suggestion that "Brooklyn Union was required to provide notice, for example, in the early or mid-twentieth century." (NYSCEF No. 1228 at 19.) But Century also characterizes the notice issue here as one involving an excuse. (*Id.* at 18.) The issue of excuse comes into play when the policyholder has failed to provide timely notice but contends that it is entitled to coverage anyway because a good-faith, reasonable basis existed for its failure. (*See Security Mut. Ins. Co. of N.Y. v Acker-Fitzsimons Corp.*, 31 NY2d 436, 440-441 [1972]; *accord Kim v Maher*, 226 AD2d 350, 350 [2d Dept 1996]; *Reynolds Metal Co. v Aetna Cas. & Sur. Co.*, 259 AD2d 195, 199-200 [3d Dept 1999].) If, as Century says, Brooklyn Union must now provide an excuse for delaying in providing notice from the 1940s or 1950s until 1993 (*see* NYSCEF No. 1228 at 19), that position necessarily entails the view that notice was due 80-odd years ago.

Century's additional assertion that "this *is* an excuse case" because "Brooklyn Union offered reasons for why it did not provide notice earlier—i.e., excuses" is no more than too-clever wordplay. (*Id.* at 18 [emphasis in original].) This assertion elides the material difference between (i) offering reasons why notice was not due until a particular point in time, and (ii) offering reasons why notice, although due earlier, was not provided until that point in time.

[* 10]

attachment points being reached. The question remains when a reasonable policyholder would find it reasonably likely that Brooklyn Union would incur an amount in environmental-cleanup liability that would equal each policy's attachment point. The only effect of considering allocation is to alter what dollar figure in cleanup liability would equal the attachment point.

Take, for example, the Metropolitan MGP site, as covered by the Century excess policy in effect from 1941 to 1946. Absent allocation, the notice inquiry is the point in time at which a reasonable policyholder in Brooklyn Union's position would believe it reasonably likely that Brooklyn Union would suffer $100,000 in covered cleanup liability for that site. As found by the jury, the post-allocation notice inquiry considers when a reasonable policyholder would believe it reasonably likely that Brooklyn Union would suffer $2.6 million in covered cleanup liability for that site. (*See* NYSCEF No. 1281 at 43.) The dollar amount needed to reach the attachment point for notice purposes might change. The nature of the notice inquiry itself does not.

Century claims that if this court were correct that "a jury deciding whether notice of occurrence is timely must consider allocation, then surely there would be other jury trials where this actually happened"—and that there are not. (NYSCEF No. 1228 at 20.) But the parties, and this court, have found only four reported instances in which this issue was even *contested* by the parties.[15] Given the obvious incentives for policyholders to raise this argument if application (or not) of allocation would affect the timeliness of notice, the court views the dearth of prior on-point precedent as indicating more that the issue is rarely presented by coverage litigation than that this court is wrong in connecting allocation and notice.

Century also argues that this court's notice-and-allocation ruling led to unfair prejudice to Century from two references during the four-week trial to the effects of allocation. (*Id.* at 21.) This court is not persuaded that Century was meaningfully prejudiced by these references[16]—let alone so prejudiced as to support setting aside the verdict and granting a new trial.

---

[15] *See Century Indemnity Co. v Keyspan Corp.*, 2007 NY Slip Op 50957[U] [Sup Ct, NY County 2007]; *Long Is. Light Co. v Allianz Underwriters Ins. Co.*, Sup Ct, NY County, Dec. 30, 2003, Gammerman J., Index No. 604715/1997, *affd as mod. Long Is. Light. Co. v Allianz Underwriters Ins. Co.*, 24 AD3d 172 [1st Dept 2005]; *New York State Elec. & Gas Corp. v Century Indem. Co.*, 767 F. App'x 188 [2d Cir 2019]; *Travelers Indem Co. v Northrup Grumman Corp.*, 2020 WL 1469550 [SD NY Mar. 26, 2020].) Justice Gammerman's decision in *Long Island Lighting Co.* is reproduced on the docket of the current action at NYSCEF No. 621.

[16] To the contrary, considered in context the second of the two statements Century cites, made by Brooklyn Union's counsel during summation, emphasized the *limits* of the damages that Brooklyn Union was seeking from Century, so as to persuade the jury that Brooklyn Union's claimed damages were reasonable. Counsel said that although "under any outcome in this case, no matter what you [decide], Brooklyn Union is bearing the lion's share of the costs . . . . [t]his *is a Brooklyn Union problem*." (NYSCEF No. 1296 at Tr. 3083 [emphasis added].) Century, on the other hand, "only provided insurance for that 28-year period," so "that's all they have to pay for. But that's their fair share." (*Id.*) This statement is not unfairly prejudicial to Century in the way Century now suggests.

[* 11]

## 2. Century's challenges to this court's trial rulings on notice-related evidence

Century argues that during trial, the court improperly prevented Century from responding to testimony by Brooklyn Union's witness Tracey Bell about New York City regulatory interest in Brooklyn Union's Coney Island MGP site—to which Century did not object when it was offered (NYSCEF No. 1296 at Tr. 1209-1210)—with memos written by Bell about the Coney Island site. (NYSCEF No. 1228 at 22-25.) With respect to the Bell memos identified as CX-0692 and CX-0807, this court remains of the view that Brooklyn Union did not open the door to admission of these memos and questioning of Bell about these memos beyond what was permitted by the court at trial. Additionally, the memos carried limited probative value with respect to the issues at trial for which they were relevant; and permitting Century to introduce the memos and ask more questions about environmental contamination and investigations at the Coney Island site had the potential to confuse the jury. Exclusion of these two memos did not unfairly prejudice Century in any event.[17]

Century also argues that the court should have let Century tell the jury about pre-1993 communications between Brooklyn Union and another insurer, AEGIS, and with the Public Service Commission; and about the full contents of an internal memo sent by a Brooklyn Union vice president. (NYSCEF No. 1228 at 25-26; NYSCEF No. 1304 at 21-24.) With respect to the AEGIS-related communications, this court held pretrial that those documents should be excluded. (*See Century Indem. Co. v Brooklyn Union Gas Co.*, 2022 NY Slip Op 50080[U], at *2-3 [Sup Ct, NY County 2022].) This court adheres to that conclusion now. The court similarly adheres to its conclusion at trial that the 1992 communication from Brooklyn Union to the Public Service Commission should be redacted in part, Century's objections to those redactions notwithstanding. (*See* NYSCEF No. 1296 at Tr. 2568-2569.) And this court continues to believe that it properly excluded, as more prejudicial than probative, the parts of the memo on which Century now relies. (*See id.* at Tr. 2496.)

Additionally, Century maintains that the court erred, and prejudiced Century, by permitting Brooklyn Union to introduce evidence that "Century waited years—including years after it disclaimed coverage in 2001 by filing this declaratory judgment complaint—before determining that Brooklyn Union's notice was late." (NYSCEF No. 1228 at 29-30.) The court disagrees. A delay in disclaiming, standing alone, will not effect a waiver. But that does not

---

[17] Century also argues that it was prejudiced by the exclusion of a third memo prepared by Bell, identified as CX-0680. (NYSCEF No. 1228 at 24-25.) But as Brooklyn Union points out, Century never sought *admission* of this particular memo. Nor did this court ever exclude it. Century contends on reply that the memo was one of several Coney Island-related memos that it sought to introduce at the same time, and suggests that it understood CX-0680 to be excluded on the same grounds as CX-0692 and CX-0807. But Century did not put CX-0680 before the court in the same way as the other memos; and there is no indication in the record that the *court* understood itself as ruling on CX-0680 in addition to the other two. To the contrary, the court's statement, relied on by Century, that a document is inadmissible because it "concerns Coney Island" (NYSCEF No. 1296 at Tr. 1293) is, in context, referring only to CX-0692—not Bell's Coney-Island-related memos more broadly. (*See id.* at Tr. 1286-1293 [discussion of relevance and admissibility of CX-0692].)

[* 12]

mean that the passage of time is *irrelevant*, as Century suggests (*id.* at 29). (*See Long Is. Light. Co. v American Re-Ins. Co.*, 123 AD3d 402, 403-405 [1st Dept 2014] [considering a reinsurer's delay in disclaiming as a relevant factor in the waiver inquiry].) And this court already rejected Century's arguments (NYSCEF no. 1228 at 29-30) that the filing (and contents) of the complaint in this action in 2001 rendered any post-2001 waiver evidence immaterial. (*See Century Indem. Co. v Brooklyn Union Gas Co.*, 2022 NY Slip Op 50076[U], at *2-4 [Sup Ct, NY County 2022]; *Century Indem.*, 2018 NY Slip Op 52018[U], at *10.)

### 3. Century's challenge to this court's refusal to give the jury a duty-to-investigate instruction

This court instructed the jury that under the Century policies, Brooklyn Union had to give notice "upon the happening of an accident or occurrence that was reasonably likely, based on the information available to Brooklyn Union," to cause Brooklyn Union "to be required by law to pay an amount of money large enough to trigger the Century policies." (NYSCEF No. 1296 at Tr. 3151-3152.) Century contended during the process of drafting the charge (*see* NYSCEF No. 1172 at 7-9; NYSCEF No. 1182 at 3-4), and argues again now (NYSCEF No. 1228 at 26), that Century was entitled to an additional instruction that "a policyholder has a duty reasonably to investigate the possibility of claims against it." This court disagrees.

Century's position, as this court understands it, is essentially that a policyholder cannot rest on the information available to it, but also must affirmatively act to *increase* the available information. (*See* NYSCEF No. 1228 at 26-29 [arguing that Brooklyn Union's asserted lack of knowledge of the extent of contamination or potential liability would not absolve Brooklyn Union from the duty to give notice "because Brooklyn Union could have *gained* knowledge through reasonable investigation"] [emphasis added]; NYSCEF No. 1304 at 24-26.) But Century has not, whether at trial or on this motion, pointed to record evidence that would warrant a jury instruction on this issue.

In arguing that a duty to investigate existed here, Century cites decisions of the Court of Appeals and the First Department. (*See* NYSCEF No. 1304 at 24-25, citing *Security Mut. Ins. Co. of N.Y. v Acker-Fitzsimons Corp.*, 31 NY2d 436, 443 [1972], and *Travelers Indem. Co. v Orange & Rockland Utils., Inc.*, 124 AD3d 436, 437 [2015].) But those decisions hold only that a policyholder's duty to investigate arises when the policyholder is placed on *inquiry notice* of a potentially covered loss—not that a policyholder owes a freestanding duty to investigate in every case.[18] (*See Acker-Fitzsimons*, 31 NY2d at 441-442; *Orange & Rockland.*, 124 AD3d at 436-

---

[18] Century also relies on language from *Christiania General Insurance Corp. of New York v Great American Insurance Co.* (979 F2d 268, 275-276 [2d Cir. 1992]) that a policyholder's obligation to provide its insurer notice arises when the policyholder, "complying with its duty to use due diligence in investigating potential claims against it[,] would believe from the information available that its policy would be involved." (NYSCEF No. 1228 at 27; NYSCEF No. 1304 at 25.) But *Christiania* did not (and did not have occasion to) discuss when and under what circumstances that duty to investigate exists or may arise. The Second Circuit's decision in *Christiania* (a reinsurance case) makes clear that the record gave rise to a material dispute of fact

437; *accord Empire City Subway Co. v Greater N.Y. Mut. Ins. Co.*, 35 NY2d 8, 12 [1974]; *Travelers Indem. Co. v Orange & Rockland Utils., Inc.*, 73 AD3d 576, 576-577 [1st Dept 2010].) The trial record in this case does not show that Brooklyn Union was placed on inquiry notice of potential claims against the Century excess policies before 1993.

For these purposes, the question is whether (and when) Brooklyn Union would have been placed on inquiry notice of occurrences that appeared reasonably likely to involve the Century excess policies—that is, a reasonable likelihood of property damage leading to government-mandated cleanup costs large enough to exceed those policies' attachment points. (*See Century Indem. Co.*, 74 Misc 3d at 738, citing *Century Indem. Co. v Keyspan Corp.*, 2007 NY Slip Op 50957[U], at *8 [Sup Ct, NY County 2007]; *cf. Orange & Rockland.*, 73 AD3d at 577 [contrasting the "standard with regard to a primary liability policy, such as involved here," which is "simply awareness of a reasonable possibility that the policy will be implicated," with the "much more lenient standard for the timing of notice applicable in excess insurance cases"].)

At trial and on this motion, Century relies on three principal categories of evidence. (*See* NYSCEF No. 1228 at 28; NYSCEF No. 1174 at 3-4 [letter to the court about what the jury charge should say].) But this evidence, without more, does not show that Brooklyn Union was placed on inquiry notice of (i) environmental contamination at the three MGP sites at issue here (or related contamination of the Gowanus Canal) that would (ii) entail government-mandated remediation that would (iii) cost more than the attachment points of the Century policies.

Two of these three categories comprise (i) internal documents from the 1960s relating to the decommissioning of the Citizens MGP, and (ii) testimony from Brooklyn Union's engineer, Bell, that she was aware before 1993 that it was possible that the three MGP sites were contaminated. (*See* NYSCEF No. 1228 at 28.) This evidence demonstrates, at most, that had Brooklyn Union gone looking, it might have found evidence of contamination on the MGP sites at issue.[19] But these categories of evidence do not show that Brooklyn Union was put on notice of the *need* to go looking for contamination before 1993, never mind looking into the likelihood that federal, state, or local environmental regulators would require costly cleanup of those sites. The third category relates to consideration by Brooklyn Union of the possibility of trying to recover costs (whether through insurance coverage or rate recovery) that it might have to incur to remediate its MGP sites. (*See id.*, citing NYSCEF No. 1238 and NYSCEF No. 1296 at Tr. 2707.) This evidence does not relate to the MGP sites at issue in this case (as opposed to Brooklyn Union's MGP sites generally), nor show that Brooklyn Union received information prior to 1993 pointing to the existence of contamination on those sites, in particular, that environmental regulators would require Brooklyn Union to remediate.

In short, one could reasonably conclude from the trial record that Brooklyn Union was not proactive in seeking information about the extent of contamination on the three MGP sites at

---

about whether the insurer had been on inquiry notice of potential claims well before it provided notice of those claims to its reinsurer. (*See* 979 F2d at 272-273, 275-276.)

[19] Assuming, of course, that Brooklyn Union had been able to gain access to the Fulton and Metropolitan MGP sites, which it concededly did not own or control in the late 1980s and early 1990s. (*See* NYSCEF No. 1228 at 28; NYSCEF No. 1296 at Tr. 1252-1253.)

[* 14]

issue here. But that is far short of the showing made in cases like *Orange & Rockland* that a policyholder engaged in a "willful failure to investigate . . . despite the overwhelming evidence of potential contamination" at former MGP sites. (124 AD3d at 437.) Century did not show at trial, and does not show now, that Brooklyn Union received evidence before 1993 putting it on inquiry notice of potential contamination at the three MGP sites that could entail remediation costs implicating the Century policies—as required to warrant a duty-to-investigate jury instruction.

### B. Century's Sufficiency/Weight of the Evidence Challenges to the Jury's Verdict

Century also argues that insufficient evidence supports the jury's findings with respect to the end date of property damage at the three MGP sites and the Gowanus Canal—an important issue for allocation purposes—or that those findings are against the weight of the evidence. Century requests entry of judgment as a matter of law in its favor "as to the end of property damage at the three MGP sites," or "at least a new trial." (NYSCEF No. 1228 at 1.) Century's request is denied.[20]

#### 1. Background

As discussed in the introduction to this decision, the jury was asked at trial to decide when property damage at the three MGP sites, and the associated property damage to the Gowanus Canal, began and ended, so as to determine what share of Brooklyn Union's cleanup costs must be borne by Century. Only the jury's findings about the end dates of property damage at each site are at issue on this motion.

At trial, the parties offered starkly different understandings of whether and when property damage ended. Century contended on summation that the jury should find an end date of 2050, because Brooklyn Union's expert had testified that tar in the subsurface "is still moving today," and will continue "slow movement" at least "until 2050, let's say, or 2060." (NYSCEF No. 1296 at Tr. 2987-2988.) Century also argued that this end date would be appropriate based on "all of the work that remains to be done" on the three MGP sites and the Canal, asserting that "this contamination is pollution still happening every day," and that it "is going to happen for years to come . . . until all of this work is done." (*Id.* at Tr. 2988.)

Brooklyn Union, on the other hand, argued that the end date should be "the dates that Brooklyn Union committed," or was ordered, to "clean this stuff up," because it was "at that point that the damage at those sites was identified" and was "fixed in the sense that it was isolated." (*Id.* at Tr. 3062.) Brooklyn Union has "been working to clean [the damage] up since then," with those efforts "stop[ping] the damage," rather than "causing new damage" or "making

---

[20] The parties contest whether any supplemental trial could be conducted solely by the court or would have to be held before a jury. (*Compare* NYSCEF No. 1228 at 11-13 & n 6 and NYSCEF No. 1304 at 12-13 [Century, arguing that this court could hold a bench trial], *with* NYSCEF No. 1284 at 11-12 & n 2 [Brooklyn Union, arguing that a jury trial is required].) Given this court's resolution of Century's challenge to the jury's verdict, the court does not reach that question.

the problem worse." (*Id.* at Tr. 3062-3063.) Those dates, Brooklyn Union said, were 2002 for the Citizens site, and 2007 for the Fulton and Metropolitan sites. (*Id.* at Tr. 3062.)

The jury agreed with neither side. The jury found that property damage at each MGP site had ended—and to that extent rejected Century's position that property damage will continue until at least 2050. (*See* NYSCEF No. 1281 at 20 [Citizens site], 30 [Fulton site]; 40 [Metropolitan site].) But the jury did not adopt Brooklyn Union's assumption-of-responsibility theory of the end dates of property damage, either. Instead, the jury found that property damage ended in 2017 at the Citizens site, in 2015 at the Fulton site, and in 2002 at the Metropolitan site. (*Id.* at 21, 31, 41.) Century now challenges those findings.

### 2. Legal standard

To set aside a jury verdict on sufficiency grounds and enter judgment for the moving party as a matter of law, a court must conclude that "there is simply no valid line of reasoning and permissible inferences which could possibly lead rational [people] to the conclusion reached by the jury on the basis of the evidence presented at trial," such that it would be "utterly irrational for a jury to reach the result it has determined upon." (*Cohen v. Hallmark Cards, Inc.*, 45 NY2d 493, 499 [1978].) In assessing this issue, the court must consider the evidence in the light most favorable to the nonmoving party, affording that party "every inference that may properly be drawn from the evidence presented." (*Dinardo v. City of New York*, 13 NY3d 872, 874 [2009].) Alternatively, if a party is challenging the jury's verdict as against the weight of the evidence (and therefore seeking only a new trial, not entry of judgment as a matter of law), that party must establish that "the evidence so preponderate[d] in favor of the [moving party] that [it] could not have been reached on any fair interpretation of the evidence." (*Killon v Parrotta*, 28 NY3d 101, 107 [2016] [internal quotation marks omitted; alterations in original].)

This court concludes that Century has not met either of these heavy evidentiary burdens.

### 3. Century's challenge to the jury's findings

On this motion, Century contends that "no rational juror could have concluded that property damages has ended at any of the three MGP sites." (NYSCEF No. 1228 at 5.) Century does not, however, claim that it is entitled to a judgment that property damage at all three sites will continue until 2050—as it had maintained at trial. It asserts that it is "entitled to judgment that property damage at all three sites is continuing," and that it is "further entitled to a new trial to determine when [that] property damage will end." (*Id.*)

Century's position on this motion is in tension with its arguments at trial. Beyond arguing to the jury that property damage would continue at least until 2050, Century expressly argued to the court, in opposing Brooklyn Union's directed-verdict motion, that no reasonable jury could find property damage to have ended *before* 2050—and sought a directed verdict in Century's favor to that effect. (*See* NYSCEF No. 1296 at Tr. 2881 [arguing that "there is just no dispute here that . . . property damage is still continuing for sure," and that although "there could be a factual dispute [about property damage ending] after 2050 . . . I don't see how there could be a factual dispute before."]; Tr. 2884 ["[W]e think for those reasons that they haven't offered any

evidence from which a reasonable jury could conclude that the property damage ended before or will end before 2050"]; Tr. 2886-2887 [arguing that "again we think no reasonable juror could conclude that that factual question [about property damage ending] could be answered with any date before 2050," and that "[f]or purposes of efficiency[,] we would ask for a directed verdict that 2050 is the end of the allocation period."].[21])

At the same time, this court concludes that Century's attack on the jury's factual findings should not be considered waived. As noted above, the jury rejected each side's proffered end dates; and neither Century nor Brooklyn Union contend on this motion that the jury was required to have adopted those respective end dates. If Century were correct that no valid line of reasoning, or any fair interpretation of the evidence, could support the jury's own chosen dates, the jury's special verdict on this issue would be unsustainable. The court declines to look past the possibility that the verdict is fundamentally flawed in this respect. Nor, in any event, does Brooklyn Union argue that Century's challenge to this aspect of the jury's verdict should fail as unpreserved.

This court therefore reaches Century's challenge to the verdict. On the merits, this court holds that the jury's findings are supported by a valid line of reasoning and represent a fair interpretation of the evidence at trial.

### a. Defining "ongoing property damage"

In disputing whether and when property damage on the MGP sites ended, the parties each employ a legal framework laid out in the decision of the U.S. Court of Appeals for the Second Circuit, applying New York law, in *Olin Corp. v Certain Underwriters at Lloyd's London* (468 F3d 120 [2d Cir 2006].) (*See* NYSCEF No. 1228 at 6 and NYSCEF No. 1304 at 2-3 [Century]; NYSCEF No. 1284 at 4-5 [Brooklyn Union].) This court sees no basis to depart from that framework, especially in light of the parties' evident agreement.

In *Olin*, the district court had instructed the jury that for allocation purposes, property damage occurred only during the period of active pollution, in the sense of a factory or plant continuing to dispose of or discharge contaminants into soil or groundwater. (468 F3d at 127.) The court instructed that migration of contamination within the soil and groundwater after the end of active pollution, on the other hand, would not constitute ongoing property damage. (*Id.* at 127-128.) In appealing from the jury's verdict, the insurer argued that this instruction was erroneous, and that property damage should be deemed to continue until remediation begins. (*Id.* at 128, 131.)

The Second Circuit rejected both these positions. It held, for allocation purposes, that property damage should be understood to continue to occur "as long as contamination continues

---

[21] At oral argument on the current motions, Century contended, citing page 2881 of the transcript, that its position on the directed-verdict motion preserved an argument that property damage ended at some point between 2020 and 2050. Century's statements on page 2881, as quoted above, do not bear out that contention. Nor do Century's statements on the ensuing transcript pages.

to increase or spread, whether or not the contamination is based on active pollution or the passive migration of contamination into the soil and groundwater." (468 F3d at 131.) Under this approach, property damage does not *necessarily* continue until remediation begins, if the pollution first "reaches its maximum point"—*i.e.*, if the "total extent of contamination" has ceased to spread, or ceased to increase in intensity within the existing three-dimensional volume of contamination. (*Id.*) As a corollary, that soil or groundwater continues to be polluted does not, standing alone, mean that property damage is ongoing for allocation purposes, as long as the volume or intensity of pollution does not increase. (*See id.*) That pollution is instead, in essence, the continuing effects of *completed* property damage.

Applying this framework, the *Olin* court concluded that "a new trial is almost certainly required" to determine "the period in which property damage occurred." (*Id.* at 132.) The Second Circuit declined, however, to direct a new trial outright, but remanded for the district court to decide whether a new trial was needed. It explained that remand would give the district court an opportunity to examine the record to see whether the policyholder had "introduced any evidence by which a rational juror could conclude property damage, including the passive spread of contaminants, ended before remediation." (*Id.*)

The question before this court, then, is whether a rational juror could fairly conclude based on the trial record that the property damage at each of the three MGP sites—and the associated damage to the Gowanus Canal—has already ended, and did so no later than the dates found by the jury. The court holds that a rational juror could fairly reach that conclusion.

The court's analysis of this question proceeds in four parts, considering the status of each of the three MGP sites, and then the Gowanus Canal as a whole.[22]

### b. Applying the *Olin* definition to the Citizens MGP site

As noted above, the jury found that property damage at the Citizens site ended in 2017. To show that this finding was supported by the record, Brooklyn Union points to a 2016 report, admitted at trial, prepared by one of its environmental-remediation contractors. (*See* NYSCEF No. 1284 at 7-8, citing NYSCEF No. 1290 [BX527].) This report states that, among other things, between 2011 and 2016, "over 30,000 gallons of fluid," the vast majority of it consisting of NAPL (non-aqueous-phase liquid),[23] "have been removed from the subsurface as part of the on-

---

[22] Under the language of the policy, the environmental damage to the Canal due to MGP operations is not itself a separate occurrence, but forms part of the occurrences at each MGP site. (*See Century Indem. Co.*, 2018 NY Slip Op 52018[U], at *4-6.) As reflected in the parties' arguments on this motion, however, the evidence at trial dealt with the harm to (and remediation of) the Canal as a whole, and did not split out the particular harms to the Canal that resulted from each of the three MGPs. The court concludes that it is most economical, and clearest, to consider separately the question whether and when property damage to the Canal ended. Doing so also tracks the approach taken by the parties in their post-trial briefing.

[23] Non-aqueous-phase liquids are chemical substances, such as coal tar, that are in liquid form but are not soluble in water. (*See* NYSCEF No. 1296 at Tr. 474, 522; *accord* NYSCEF No. 1231 at ii n 2 [BX506] [same].)

[* 18]

going interim . . . recovery program at the Site." (NYSCEF No. 1290 at 4.[24]) The report also reflects the contractors tested the rate at which NAPL moves through subsurface soil. Those tests determined that in many areas of the Citizens site, it was moving quite slowly—to the point that many recovery wells there would recover minimal amounts of NAPL. (*See id.* at 4-5.)

This evidence is not overwhelming. Nonetheless, this court agrees with Brooklyn Union that, considered in the light most favorable to the verdict, it is sufficient to support the jury's findings on the Citizens site. A rational jury could fairly understand the evidence to indicate that remedial measures undertaken by Brooklyn Union had, by 2017, meaningfully reduced the intensity of contamination at the Citizens site within the existing polluted volume of soil; that this contamination was continuing to be reduced; and that it was unlikely that passive subsurface migration of NAPL or other contaminants would expand the volume of pollution. Under the *Olin* framework, these findings would support a conclusion that pollution of the soil at the Citizens site had reached its maximum extent by 2017, such that property damage had ended for allocation purposes.

Century, in challenging this finding, does not contend that a rational juror would be unable to interpret the evidence described above in the manner that Brooklyn Union proposes. Nor does Century identify other evidence in the record calling this interpretation into question— for example, by showing that subsurface pollution in the Citizens site had continued to expand (or increase in intensity) after 2017. Century argues only that the conclusion lacks a proper basis because "there is no trial evidence suggesting that the remediation at this site was completed by 2017." (NYSCEF No. 1228 at 11; *accord* NYSCEF No. 1304 at 11 [same].) But that is not the governing legal test. *Olin* does not say that remediation must be complete before property damage is considered to have ended (at least for allocation purposes). Indeed, *Olin* carefully leaves open the possibility that in some circumstances property damage will end before remediation even *begins*. (*See* 468 F3d at 131.) The relevant question, under *Olin*, is whether "contamination continues to increase or spread," or has "reach[ed] its maximum point." (*Id.*) In the latter scenario, property damage has ended in the relevant sense, even if polluted soil or groundwater remains to be remediated.

This court agrees with Brooklyn Union that sufficient trial evidence supports the jury's finding that the subsurface pollution at the Citizens site had reached its maximum extent by 2017.

### c. Applying the *Olin* definition to the Fulton MGP Site

The jury found that property damage at the Fulton site ended in 2015. In defending this finding, Brooklyn Union points to the 2015 record of decision for the site issued by the State Department of Environmental Conservation (DEC). (*See* NYSCEF No. 1284 at 6-7, citing NYSCEF No. 1232 [BX522].) Brooklyn Union argues that a rational jury, considering the remedial measures directed by this decision, could find that those measures "reflected a

---

[24] Citations in this opinion to remediation-related decisions and reports use those documents' internal pagination, not the PDF pagination assigned by the parties for purposes of the documents' use as trial exhibits (and used in the parties' post-trial memorandums of law).

determination [by DEC] that any limited subsurface migration was not actively contributing to ongoing property damage, let alone expanding the footprint of such damage, by 2015." (*Id.* at 7.) Considering the evidence in the light most favorable to the verdict, this court agrees.

The DEC decision directs two remedial measures with respect to Fulton-MGP-related contamination occurring on land—as opposed to contamination of the Gowanus Canal and the sediments under the Canal stemming from the Fulton site.[25] One measure involves construction of "coal tar recovery wells . . . behind [a] barrier wall" that will be built between the Fulton site and the Canal, "to collect coal tar that accumulates behind the wall"; and "[c]oal tar collection wells . . . in upland areas where mobile coal tar is identified by [DEC] in the subsurface." (NYSCEF No. 1232 at 2-3.) The other measure—to be undertaken at some point in the future— consists of "[e]xcavation of MGP structures" on the site, "including gas holder foundations and tanks, and immediately adjacent source areas and grossly contaminated soil," with the supports for this excavation process to be "left in place as a coal tar migration barrier to prevent mobile NAPL from re-contaminating the remediated areas." (*Id.* at 5.)

Century contends that it is "is impossible for property damage to have ended at the upland Fulton site before Brooklyn Union even began the process of containing and removing all the tar its MGP operations left behind." (NYSCEF No. 1228 at 10.) But Century does not point to evidence demonstrating (or even suggesting) that this tar will continue to spread (or will later spread) beyond the existing volume of subsurface pollution on the Fulton site until Brooklyn Union builds the required recovery and collection wells. Considering the evidence in the light most favorable to the verdict, a rational jury could find that the coal-tar removal measures represent efforts not to prevent the expansion of environmental contamination, but to reduce that contamination from its present maximum extent.

Century similarly points to Brooklyn Union's obligation to "excavate approximately 30,000 cubic yards of tar-contaminated soil"—work that "has not yet begun, and that has no date certain by which it will occur." (*Id.* at 11.) But, as *Olin* makes clear, the continued presence of contaminated soil in the Fulton subsurface does not itself mean that property damage is ongoing: The material question is whether the soil is becoming *more* contaminated or whether water (or NAPL) migrating through that soil "flow[s] on to contaminate new areas." (468 F3d at 131.) Century does not point to any evidence that either of these scenarios is occurring. And, as Brooklyn Union points out (NYSCEF No. 1284 at 7), DEC's "decision to defer addressing subsurface MGP structures" and the surrounding soil suggests that the scenarios are not occurring.[26]

---

[25] The DEC also directed Brooklyn Union to build a barrier wall between the Fulton MGP site and the Gowanus Canal. This measure is discussed in the Gowanus Canal-specific section, *infra*.

[26] Century argues that one could see this decision by the DEC differently, as "simply mean[ing] that other remedial measures took regulatory priority." (NYSCEF No. 1304 at 11.) But it would not be irrational, or a fundamentally unreasonable interpretation of the evidence, for a jury to adopt Brooklyn Union's view over Century's. On a CPLR 4404 motion, no more is required to sustain the verdict.

[* 20]

Additionally, Century argues that because the coal-tar wells, and soil-excavation structures, are intended in part to prevent "recontamination of previously remediated third-party property," property damage in the form of that recontamination remains ongoing. (NYSCEF No. 1304 at 10; *see also* NYSCEF No. 1228 at 11 [arguing that the "whole point of [the soil-excavation] remedy is to prevent further NAPL contamination"].) Century provides no authority for this proposition. Nor does it follow as a matter of logic. For purposes of assessing the jury's finding, the relevant baseline in applying *Olin*'s maximum-extent-of-pollution standard would be the condition in 2015 of the soil and groundwater in the Fulton subsurface. Post-2015 recontamination might halt a remediation-based decrease in the extent of pollution. But it would not necessarily bring about an *increase* in the spread or intensity of pollution above the 2015 baseline.[27] And Century does not identify evidence in the trial record compelling a conclusion that recontamination would have that effect here.

This court agrees with Brooklyn Union that sufficient trial evidence supports the jury's finding that the subsurface pollution at the Fulton site had reached its maximum extent by 2015.

### d. Applying the *Olin* definition to the Metropolitan MGP site

The jury found that property damage at the Metropolitan site ended in 2002. Brooklyn Union contends that this finding is rational and fairly supported by a 2003 remediation report reflecting extensive remediation efforts that had been undertaken on the site through the end of 2002. (*See* NYSCEF No. 1284 at 6, citing NYSCEF No. 1282 [BX429].) This court, considering the evidence in the light most favorable to the verdict, agrees.

Century advances two arguments for why a rational jury could not have relied on this evidence to find that property damage ended in 2002. Neither is persuasive.

*First*, Century points out that the efforts through 2002 on which Brooklyn Union relies did not completely remediate the Metropolitan site; and that more investigation (and likely more remediation) of the remaining areas of pollution still remains to be undertaken. (NYSCEF No. 1304 at 8.) But again, the *Olin* standard does not require that pollution-remediation be *completed* before property damage will be considered to have ended (at least for allocation purposes)—only that the pollution have reached its maximum extent.[28] (*See Olin*, 460 F3d at 131.)

---

[27] Alternatively, when dealing with soil and groundwater that is contaminated as of 2015, then remediated, then recontaminated, one might take the baseline to be the condition of that soil and groundwater immediately before its recontamination. In that scenario, the recontamination would increase the intensity of pollution in the formerly remediated area, thereby constituting property damage under *Olin*. At most, though, that increase would be *future* property damage that has begun to reoccur after a gap in time, not property damage ongoing *in 2015*. Century does not explain why the possibility of such not-yet-begun property damage should undermine the jury's verdict.

[28] Century also relies on the fact that the DEC required Brooklyn Union in 2020 to build a barrier wall between the Metropolitan MGP site and the Gowanus Canal; and that this wall had not been completed as of the time of trial. (*See* NYSCEF No. 1228 at 9-10.) This barrier-wall remedy is discussed in the Gowanus Canal-specific section, *infra*.

[* 21]

*Second*, Century argues that the jury's finding of a 2002 end date is irrational, because Brooklyn Union itself argued on summation that property damage only ended at Metropolitan in 2007. (NYSCEF No. 1228 at 9, citing NYSCEF No. 1296 at Tr. 3062; NYSCEF No. 1304 at 8 [same].) But the trial transcript reflects that Brooklyn Union's position on this point did not rest on a factual contention about the state of the soil and groundwater at Metropolitan in 2007 (or 2002). Rather, Brooklyn Union advocated for a 2007 end date for Metropolitan as part of a broader argument that property damage at the three sites should be treated as having ended when Brooklyn Union accepted responsibility for remediating that damage—"the dates that Brooklyn Union committed to clean this stuff up . . . or committed and [was] ordered to" undertake clean-up. (NYSCEF No. 1296 at Tr. 3062.) This is much closer to being a *legal* argument about how to define the end of property damage than a factual characterization of the volume of coal-tar-based contamination in the soil and groundwater, as Century now suggests.

Crucially, the jury *rejected* Brooklyn Union's commitment-to-cleanup argument. (*Compare id.* [proposing end dates of 2002 for Citizens and 2007 for Fulton and Metropolitan], *with* NYSCEF No. 1281 at 21, 31, 41 [finding end dates of 2017 for Citizens, 2015 for Fulton, and 2002 for Metropolitan].) The jury's rejection of Brooklyn Union's argument worked in Century's favor with respect to the Citizens and Fulton sites—just not with respect to the Metropolitan site. (*See id.*) That difference, though, does not make the jury's Metropolitan findings irrational or against the weight of the evidence.[29] As discussed above, this court concludes that they were neither.

### e. Applying the *Olin* definition to the Gowanus Canal

Century argues that the jury's verdict was irrational, or at least could not be reached on a fair interpretation of the evidence, because "undisputed evidence shows that the Gowanus Canal property damage that regulators are requiring Brooklyn Union to clean up is ongoing." (NYSCEF No. 1228 at 6.) That is, remediation measures directed by the EPA and the DEC with respect to the Canal—both the dredging of the Canal and capping of Canal sediments, and the construction of barrier walls between the Canal and the Fulton and Metropolitan MGP sites— had not been completed as of 2017. (*Id.* at 6-7.) As a result, Century argues, damage to the Canal—and thus also to the three MGP sites—necessarily remains ongoing for allocation purposes. (*Id.* at 6.) This argument, although not without force, is ultimately unpersuasive in the specific factual circumstances present here.

As an initial matter, Century suggests that the jury might have erred out of confusion about whether damage to the Canal counted as property damage for allocation purposes, because "the verdict-form questions concerning the property damage beginning and end dates at each MGP site" did not expressly mention the Gowanus Canal sediments. (*Id.* at 7-8.) This suggestion

---

[29] There is also no merit to Century's assertion that the jury's 2002 end date is "logically impossible" because "Brooklyn Union did not even agree to a clean-up remedy at Metropolitan until 2007." (NYSCEF No. 1228 at 2.) As *Olin* emphasizes, property damage can, in appropriate circumstances, end for allocation purposes before the start of remediation. Whether those circumstances are present in any particular case is a factual question. (*Olin*, 468 F3d at 131-132.)

is unpersuasive. The court's charge to the jury repeatedly emphasized that the property damage at issue in the case included both harm "to the groundwater of the three MGP sites and damage to the sediments of the Gowanus Canal." (NYSCEF No. 1296 at Tr. 3145-3146; *accord id.* at 3146, 3147, 3151, 3153.) Century does not identify a basis in the record, other than the jury's findings, to believe that the jury was nonetheless confused. (*See* NYSCEF No. 1228 at 7-8; NYSCEF No. 1304 at 7.) But, as discussed below, those findings constitute a rational and fair reading of the trial record in this case.

**Dredging the Canal.** As previously discussed, the question for allocation purposes is *not* whether contaminants remain at a polluted site, but whether the volume of that contamination, or the intensity of contamination within that volume, is increasing. It is not the case, as Century suggests, that property damage *necessarily* continues because "the Canal sediments have not yet been dredged, the sediment has not been capped, and . . . there are still pollutants in the Canal." (NYSCEF No. 1228 at 7.) One must instead consider the purposes those uncompleted remedial measures will serve—that is, whether the measures are necessary to halt further expansion or intensification of pollution of (or under) the Canal or, alternatively, to reduce pollution from a maximum extent that has already been reached.

A rational jury could find that the EPA- and DEC-mandated measures are needed only to reduce the contamination of the Canal. For example, EPA's report of its decision with respect to required remedial measures reflects that the Canal's groundwater and its surface and subsurface sediments are already thoroughly contaminated with, among other things, NAPL and associated chemical compounds. (*See* NYSCEF No. 1231 [BX506] at 20-22, 24, 26-27, 29, 49.) Dredging the Canal to remove the entire top layer of sediments (so-called "soft sediment"[30]) is required because that entire layer is already "grossly[] contaminated" (*id.* at 80), such that "[p]artial removal" of that layer would "leave a large volume of impacted sediments with a broad range and high levels of *residual* contamination" (*id.* at 51 [emphasis added]; *accord id.* at 49-51.) And laying down a multilayer cap on the next layer down of sediment (the "native sediments"[31]) is required, not because of the possibility of intensification of pollution of the soft sediments as they now exist, but to prevent existing contamination from working its way upward in the *future* to pollute the uppermost sediment layer beneath the Canal (*see id.* at 51, 58-61, 70-71).[32]

The need to take remedial measures to reduce the current volume and intensity of pollution is fully consistent with existing pollution having already reached its maximum extent before the completion of those measures. And as discussed in the analysis above of the Fulton MGP site, this court does not agree with Century's contention that a remedial goal of preventing future, not-yet-occurred contamination, or recontamination, is relevant to the allocation question asked of the jury—whether prior property damage is *continuing* to occur. (*See* NYSCEF No. 1304 at 5.) That Brooklyn Union, the EPA, and the DEC have not yet completed steps needed to prevent potential property damage from occurring in 2033 does not compel a conclusion that property damage is ongoing in 2023, or indeed was ongoing in 2018. And Century does not point

---

[30] *See* NYSCEF No. 1231 at 15 & n 16 (defining this "soft sediment" layer).

[31] *See id.* at 15 (defining the "native sediment" layer).

[32] Complete removal of the soft sediments will also "reduc[e] the risk of recontamination in the event of a cap failure" in the future. (NYSCEF No. 1231 at 80.)

[* 23]                                           23 of 27

to trial evidence conclusively showing that potential future recontamination would be *worse* than the pollution present as of the end of 2017 (the latest property-damage end date found by the jury).

Century also does not identify evidence in the trial record that would compel a rational jury to find that contamination within the Canal and its underlying sediments will continue to grow in volume until the dredging and capping measures are completed. Nor does Century point to evidence compelling a finding that continued pre-dredging seepage of NAPL and other contaminants into the Canal into the three MGP sites constitutes a meaningful increase in the intensity of Canal-related contamination within its existing volume—whether assessed in terms of requiring more extensive remedial measures or otherwise. On the record at trial, that dredging and capping had not yet begun as of 2017 does not undermine the jury's finding that property damage ended no later than that date for allocation purposes.

**Building Barrier Walls.** For similar reasons, there is no merit to Century's argument that property damage necessarily ended later than found by the jury because barrier walls remained to be built between the Gowanus Canal and the upland portions of the Fulton and Metropolitan MGP sites. (*See* NYSCEF No. 1228 at 9-10; NYSCEF No. 1304 at 3-4.)

It is true, as Century emphasizes, that the record contains evidence that these barrier walls are intended in part to prevent further seepage of coal tar and other contaminants into the Gowanus Canal. (*See* NYSCEF No. 1232 at 2 [Fulton]; NYSCEF No. 1247 at 1-2 [BX827] [Metropolitan].) But again, Century does not show that a jury on this trial record would be compelled to conclude this seepage would increase the pre-dredging intensity of MGP-related pollution in the Canal. As discussed above, the Canal is already thoroughly contaminated with coal tar, NAPL, and similar compounds. Additionally, evidence before the jury indicates that environmental regulators see preventing more movement of pollutants into the Canal as important to prevent future recontamination of the Canal and Canal sediments *after* the completion of dredging. (*See* NYSCEF No. 1231 at ii, 83; NYSCEF No. 1232 at 16-17.) The record also reflects that building the barrier walls before dredging is necessary to ensure Canal "bank stability during the upcoming dredging" project. (NYSCEF No. 1232 at 2, 17; *see* NYSCEF No. 1247 at 1; *cf.* NYSCEF No. 1231 at 16 [discussing the possibility that dredging would threaten the stability of existing walls and bulkhead structures along the length of the Canal].)

Measures taken to prevent *future*, not-yet-realized, property damage (*i.e.*, recontamination of remediated sediments and groundwater) would not undermine the jury's finding that the *existing* property damage ended no later than 2017. Nor would efforts quite literally to support the dredging project's removal of contaminated sediments from beneath the Gowanus Canal. As with dredging itself, a rational jury could fairly conclude that building the barrier walls is needed to help reduce pollution of the Canal from its maximum extent, not prevent the spread or intensification of that pollution.[33]

---

[33] Century's claim on this motion that no rational jury could conclude that property damage at the Fulton and Metropolitan MGP sites ended before completion of the barrier walls (*see* NYSCEF No. 1304 at 9-10) is also in tension with Century's position in prior MGP-related

Century also contends that "Brooklyn Union's argument about when property damage ends is irreconcilable with its claim that Century is responsible for the costs of remediation at the three MGP sites." (NYSCEF No. 1304 at 3.) That is, Century says, Brooklyn Union is entitled to coverage for the costs of government-mandated remediation of *property damage*. If property damage ended no later than 2017, Century's argument goes, Brooklyn Union is not entitled to coverage for post-2017 remedial measures. (*Id.* at 3-4.) But that does not follow. That property damage ended in 2017 does not mean later remediation is unrelated to property damage—merely that it is ameliorating the continuing effects of past, completed property damage, as opposed to ongoing damage. Requiring Century to cover the costs of post-2017 remediation would be no different, in that way, from requiring it to cover the costs of excavation of contaminated soil that is not (or is no longer) contributing to the spread of contamination. (*Cf. Olin*, 468 F3d at 131 [describing scenario in which presence of contaminated soil would not lead to additional property damage].) The connection required under the policy language between property damage and government-mandated cleanup costs remains under either scenario.

### 4. Century's challenge to this court's apportionment of the Gowanus Canal remediation costs among the three MGP sites

Finally, Century argues that this court erred in ruling at trial that for purposes of the Century policies' per-occurrence limits, the Gowanus Canal-related remedial costs "should be apportioned equally among the three [MGP] sites." (NYSCEF No. 1296 at Tr. 2927.) Century argues that "costs associated with cleaning up the Gowanus Canal must be divided among the three MGPs based on each MGP's relative contribution to the contamination." (NYSCEF No. 1228 at 14.) This court adheres to its ruling that, in the circumstances of this case, equal apportionment is the appropriate approach.

---

litigation. In 2014, at summary judgment in coverage litigation over Long Island MGP sites, Century took the position (and the trial court agreed) that property damage from one of those sites had continued until 2012. (*See Keyspan Gas E. Corp. v Munich Reins. Am., Inc.*, Index No. 604715/1997, NYSCEF No. 36 [mem. of law]; *Keyspan Gas E. Corp. v Munich Reins. Am., Inc.*, 46 Misc 3d 395, 397 [Sup Ct, NY County 2014], *revd on other grounds* 143 AD3d 86 [1st Dept 2016].) Century based that position on expert testimony that tar migration from MGP sites would continue until the building of a barrier wall—a barrier wall that was still uncompleted *as of 2012*. (*Keyspan Gas*, 46 Misc 3d at 397.)

In other words, Century accepted in that case—unlike here—that property damage from an MGP site had ended for allocation purposes, notwithstanding that a barrier wall needed to halt tar migration still remained to be built. This court does not mean to suggest that Century is now estopped, formally speaking, from arguing otherwise now. A certain irony exists, though, in Century's now arguing that it would be irrational for a jury to accept a position that Century itself previously accepted in similar litigation. That is particularly true given that, unlike other instances in which the stances of parties to MGP litigation have changed over time, Century's litigation interests then (arguing for a longer allocation period) are aligned with its current interests.

The policy language at issue provides excess coverage "[f]or damages because of injury to or destruction of property . . . caused by occurrence." (NYSCEF No. 1300 at 53.) Century contends that this language connects (i) the amount of harm to the Canal due to each MGP's respective operations and (ii) Brooklyn Union's liability for the costs of cleaning up the Canal; and that it requires the court to "apportion damages between occurrences accordingly." (NYSCEF No. 1304 at 14; *see id.* at 15 [arguing that the question is how much of the Canal "property damage for which Brooklyn Union is being held liable was caused by" each MGP].)

The difficulty is that, as Century conceded at trial (*see* NYSCEF No. 1174 at 17), no factual connection exists between the respective harm to the Gowanus Canal from each MGP site and Brooklyn Union's Canal-related cleanup liability. Brooklyn Union has not been held liable to remedy the particular damage to the Canal that resulted from Fulton MGP contamination, or from Metropolitan MGP contamination, or Citizens MGP contamination. Brooklyn Union is being required to pay the costs of dredging and capping the Canal *as a whole*. The need for, and nature of, that remedy is not apportioned by, or connected to, particular point sources of pollution, factually speaking.[34]

Absent a factual basis permitting a more precise allocation of Canal cleanup costs to each MGP site, this court adheres to its earlier conclusion that those costs should be apportioned evenly among the three MGPs. As Brooklyn Union points out (NYSCEF No. 1284 at 12), Century provides no authority suggesting that this approach is impermissible. To the contrary, doing so is consistent with the policy language, because it will require Century to pay to cover damages (in the form of cleanup costs) for property damage (in the form of pollution) stemming from occurrences at each MGP site. And, as a practical manner, this is the only reasonable approach.

Accordingly, it is

ORDERED that Brooklyn Union's CPLR 4404 motion to set apart one aspect of the judgment (mot seq 053) is denied; and it is further

ORDERED that Century's CPLR 4404 motion to set aside the jury's verdict and award Century judgment as a matter of law on the issue of the length of property damage or, alternatively, to direct a new trial on that issue (mot seq 054), is denied; and it is further

---

[34] In its opening memorandum of law on this motion, Century describes its expert, Dr. Suuberg, as testifying "that the Citizens site was responsible for approximately 60% of the Gowanus Canal cleanup costs, whereas the other two sites were responsible for approximately 20% each." (NYSCEF No. 1228 at 15.) But, as Century tacitly concedes on reply (*see* NYSCEF No. 1304 at 14), that description is inaccurate. The cited portions of Dr. Suuberg's testimony did not concern the proportion of cleanup costs attributable to each MGP site; they dealt with the relative volumes of tar assertedly deposited into the Canal by each MGP through their discharges of wastewater—in other words, the amount of pollution from each MGP. (*See* NYSCEF No. 1296 at Tr. 1752-1767.) Dr. Suuberg's calculations, which Brooklyn Union contests (*see* NYSCEF No. 1284 at 14), do not address whether a connection exists between each MGP site's contamination of the Canal and the later need to dredge and cap the Canal.

[* 26]

ORDERED that the parties shall meet and confer on the issue of the amount of Brooklyn Union's monetary recovery under each Century policy in light of the jury's verdict and the court's rulings, set forth above, on motion sequences 053 and 054; and it is further

ORDERED that the parties shall, within 30 days of service of a copy of this order with notice of its entry, jointly submit to the court (by e-filing on NYSCEF and email to SFC-Part7-Clerk@nycourts.gov) a proposed form of judgment with respect to the three occurrences at issue in the 2022 trial in this action; and it is further

ORDERED, in the alternative, that if the parties cannot, within 30 days of service of notice of entry, reach agreement on a proposed form of judgment, the parties shall submit a joint letter (by e-filing on NYSCEF and email to SFC-Part7-Clerk@nycourts.gov) identifying the areas of disagreement and briefly describing the parties' respective positions on those disagreements); and it is further

ORDERED that Brooklyn Union shall serve notice of entry on all parties.

HON. GERALD LEBOVITS
J.S.C.

| 1/5/2024 | | | |
|---|---|---|---|
| **DATE** | | | |

| CHECK ONE: | X | CASE DISPOSED | | NON-FINAL DISPOSITION |
|---|---|---|---|---|
| | | GRANTED | X DENIED | GRANTED IN PART | OTHER |
| APPLICATION: | | SETTLE ORDER | | SUBMIT ORDER |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | FIDUCIARY APPOINTMENT | REFERENCE |

[* 27]